Filed 12/17/21  P. v. Guerra CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID GUERRA,<br><br>    Defendant and Appellant. | C087358<br><br>(Super. Ct. No. STK-CR-FDV-2016-0007409) |

A jury convicted defendant David Guerra of kidnapping, corporal injury to a cohabitant, criminal threats, assault with a deadly weapon, forcible rape, and forcible sodomy.  As to the rape and sodomy convictions, the jury found true that in the commission of those offenses, defendant kidnapped the victim, his girlfriend.  The trial court sentenced defendant to a determinate term of 10 years eight months and an indeterminate term of 50 years to life.

Defendant now contends (1) the kidnapping, assault, rape, and sodomy convictions must be reversed because the trial court improperly instructed the jury it could consider defendant's prior incidents of domestic violence when determining his guilt on those charges; (2) the kidnapping verdicts must be reversed because the trial court erred by refusing to give a unanimity instruction; (3) the kidnapping and sodomy

1

convictions and the kidnapping enhancements must be reversed because the trial court improperly interfered with the jury's consideration of lesser included offenses; and (4) he is entitled to an additional day of presentence custody credit.

We disagree with the first two contentions but agree with the fourth contention. Regarding the third contention, we agree with it in part. We will reverse the sodomy conviction and its associated enhancements, affirm the remaining convictions and enhancements, indicate that the People may retry defendant on the sodomy charge, and direct the trial court to resentence defendant at the appropriate time and include an award of an additional day of presentence custody credit.

## BACKGROUND

Defendant and M.V. began dating in 2015. Over the next year, M.V. made numerous trips from her home in Los Angeles to defendant's home in Stockton. The trips generally lasted around weeks, and sometimes included visits to defendant's parents' home in Fairfield.

*The People's case*

i. M.V.'s testimony

In May 2016, M.V. was in Stockton with defendant but decided to return to Los Angeles earlier than originally planned, because defendant had grabbed her by the neck. Though defendant had slapped M.V. before, she was disturbed by this escalation in violence.

On Sunday May 22, 2016, M.V. drove defendant to his job at a taco truck, left to buy a train ticket for Los Angeles and to pack her things, and then drove back to the taco truck to give defendant his car and car keys. M.V. called for a taxi, and asked the driver to meet her at the taco truck so that she could leave as soon as she gave defendant his car keys.

M.V. parked defendant's car across the street from the taco truck, walked up to the taco truck, and then called out to defendant, who left the truck to talk with her. M.V. told

2

defendant she was there to give him his car keys because she was returning to Los Angeles. Defendant told M.V. she was not going to leave.

M.V. tried to get into the waiting taxi, but defendant stopped her from doing so by grabbing her waist and her hands. As bystanders watched, defendant removed M.V.'s belongings from the back of the taxi. M.V. asked a nearby person for help, but the person ignored her.

Cursing at M.V. and saying that he wasn't going to let her go, defendant forced her to cross the street and to get into his car. M.V. feared defendant "was going to hit [her] or he was going to do something else to [her] because of the way that he was grabbing" her. Defendant turned on the car's "child locks," thereby preventing M.V. from opening the back doors of the car, and started slapping her.

Defendant drove to his apartment, opened the back door of the car, and forcibly pulled M.V. out of the backseat, slapping her when she tried to get away. M.V. pleaded with defendant to let her go, but he refused.

M.V. was "a little bit dizzy" by this point, and after defendant got her into his apartment, he resumed slapping her, making her "feel[ ] weak from being hit so much." Defendant threw M.V. onto his bed, grabbed her by the neck, and continued slapping her.

Defendant told M.V. he was going to kill her, removed her clothes, and bound her hands behind her back with clear packing tape. He told her he "was going to get [her] in the shower with cold water so [she] wouldn't feel what he was going to do to [her]." As he laughed at her, defendant forced a naked M.V. to take a cold shower for 20 minutes.

After defendant let M.V. out of the shower, he retrieved a knife from his kitchen, and with gloved hands, grabbed M.V. by the neck with his left hand, forced her to kneel down, and held the knife to her neck with his right hand. Defendant told M.V. that "as soon as he . . . finished killing [her] he already had the place where he was going to bury [her]." Defendant continued slapping M.V.'s head and body.

Defendant pulled down his pants, sat on the bathroom toilet, and told M.V. to sit on top of him. Defendant began to penetrate M.V.'s anus with his penis, but when M.V. started to cry defendant did not continue the penetration.

Next, with a long barbecue lighter, defendant burned M.V.'s train ticket in front of her, telling her that she "was not going to go, that he was going to kill" her.

After he burned the ticket, defendant penetrated M.V.'s vagina with his penis as M.V. sat on the side of a sink. M.V. did not try to get away from defendant at this point, as she was feeling weak, and defendant "still had access to the knife."

Defendant told M.V. they were going to travel to his parent's house in Fairfield. But when defendant appeared to fall asleep on his bed, M.V. did not try to leave the apartment, fearing he "was pretending to be asleep." Defendant did not have a house phone, and she did not know where defendant had put her cell phone, so she was unable to call for help. Feeling "dizzy" and "a lot of weakness," M.V. slept a little.

The next morning, defendant put a towel over M.V.'s head so that "no one would see how beaten up [she] was." He took M.V. to his car, sat her in the front passenger seat, and drove away. In a car mirror, M.V. observed her face full of black and blue marks and bruises.

When defendant stopped for gas, he told M.V. to put the towel over her head and stay in the car. Though M.V. was alone, she did not try to escape because she was weak and was afraid defendant would "do something even worse" to her.

Before they met his parents, defendant told M.V. to lie about her injuries by telling his parents that she had been in a car accident.

M.V. stayed at defendant's parent's house with defendant through Friday, May 27, 2015. Defendant never left her alone at the house with his family. Though M.V. told defendant that she didn't want to have sex, he made her have sex with him every night.

They made two or three trips to Walmart, but M.V. didn't try to get help, because she "was feeling a lot of fear" and she "didn't want [defendant] to do even more things."

4

M.V. told defendant's mother she thought she was pregnant, and defendant's mother suggested she take a pregnancy test. M.V. asked defendant to take her to a hospital for the test and because she was not feeling well. Eventually, Defendant took M.V. to a hospital, telling her it was only for a pregnancy test.

When she was alone with a nurse, M.V. asked for help.

### ii. The examination

A medical examination of M.V. conducted by a sexual assault nurse revealed bruising around M.V.s' eyes, bruises on her arms and legs, and a bruise on the back of her head.

There were abrasions outside M.V.'s vagina and in the perianal tissue.

### iii. Defendant's coworkers

Two of defendant's taco truck coworkers testified.

Rosario O. said she saw defendant leave the taco truck to talk to M.V., who arrived in a taxi, but she did not hear what they said.

Defendant had a serious expression on his face, and prevented M.V. from getting into the taxi by hugging her over her arms, before he took her by the elbow and walked her to his car.

On cross-examination, Rosario said she did not witness violence between defendant and M.V. Rosario said defendant and M.V. could have been holding hands.

Lucia E. testified she thought she saw defendant, with one hand, pull M.V. (who was trying to get into the taxi) away from the taxi by her waist, and then hug M.V. around her waist as they walked to his car. The tires squealed as they drove way, like they were in a hurry.

### iv. The police

A City of Fairfield police officer responded to the hospital on May 27, 2016, and observed injuries all over M.V.'s body. M.V. was visibly upset. After the officer took a statement from her, he arrested defendant, who was in a hospital waiting room.

5

*Defendant's case*

On the second day of M.V.'s May 2016 visit to Stockton, defendant observed M.V.'s bruises. M.V. told defendant she got the bruises from falling off a horse.

During the visit, defendant and M.V. had consensual sexual intercourse. M.V. was persistent about wanting to become pregnant, and defendant did not use a condom. Sex with M.V. was always consensual, and they never had anal sex.

On May 22, 2016, M.V. came to the taco truck asking defendant why he was not answering her calls or calling her to see how she was doing. After a 10-minute conversation, during which M.V. expressed a wish that defendant have more free time in the afternoon, defendant paid for M.V.'s taxi.

M.V. never told defendant she was planning to leave Stockton that day, defendant did not stop M.V. from getting into the taxi, and defendant never grabbed M.V. in an inappropriate way, just a normal way for a couple.

Defendant and M.V. left in his car together. It was M.V.'s idea to go to defendant's parents' house the next day.

Defendant and M.V. went to Wal-Mart several times while staying at his parent's home. M.V. bought pregnancy tests there, and showed the positive test results to defendant and his mother.

On May 27, 2016, M.V. and defendant went to the hospital for a pregnancy exam. Fairfield police officers appeared at the hospital and arrested defendant.

*Procedural background*

In April 2018, a San Joaquin County prosecutor filed an amended information charging defendant with kidnapping (Pen. Code, § 207, subd. (a)),[1] corporal injury to a cohabitant (§ 273.5, subd. (a)), criminal threats (§ 422, subd. (a)), assault with a deadly

---

[1] Undesignated statutory references are to the Penal Code.

weapon (§ 245, subd. (a)(1)), forcible rape (§ 261, subd. (a)(2)), sexual penetration by a foreign object (§ 289, subd. (a)(1)(a)), and forcible sodomy (§ 286, subd. (c)(2)(a)). As to the three sex crimes, the amended information further alleged that defendant kidnapped M.V. and that the movement of M.V. substantially increased the risk of harm to her over and above the level necessarily inherent in the underlying crimes. (§ 667.61, subd. (d)(2).)

Before the jury began deliberating, the trial court granted the prosecution's motion to dismiss the charge of sexual penetration by a foreign object.

The jury found defendant guilty of the remaining six charges, and found true the kidnapping allegations as to the rape and sodomy counts.

In June 2018, the trial court sentenced defendant to an indeterminate term of 50 years to life (consisting of consecutive terms of 25 years to life for the rape and sodomy counts) and a determinate term of 10 years eight months for the remaining counts.

Apparently relying on a probation officer's presentence report, the trial court awarded 857 days of presentence credit, including 745 days of actual credit.

DISCUSSION

I

Defendant argues his kidnapping, assault, rape, and sodomy convictions must be reversed because, in contrast to his convictions for corporal injury on a cohabitant and criminal threats, they are not domestic violence crimes and the trial court improperly instructed the jury that it could consider defendant's prior incidents of domestic violence when determining his guilt on all charges.

The People counter that the claim is forfeited because defendant did not raise it in the trial court, and in any event the trial court did not err, as all of defendant's charged crimes involved acts of domestic violence because defendant used force or fear to exert control over M.V. The People further argue that even if the trial court erred, the error was harmless.

7

Regarding forfeiture, defendant maintains that even if his trial counsel had a duty to request a limiting instruction, we can reach this issue via an ineffective assistance of counsel claim.

We exercise our discretion to address the merits and conclude the trial court did not err.

A

Defendant's ex-girlfriend testified at trial that years before M.V. began dating defendant, the ex-girlfriend dated him for about seven months.  During an argument in a parking lot while they were dating, when the ex-girlfriend tried to get out of a car, defendant forcefully grabbed her wrist, pulled her back inside the car, and made her stay inside the car longer than she wanted to.

After they broke up, defendant followed the ex-girlfriend around, one time watching her house through bushes, and another time getting upset and refusing to leave her workplace when she asked him to leave, prompting her to call the police.  The ex-girlfriend sought a restraining order against defendant.

A Vacaville police officer testified that in July 2007 he responded to the ex-girlfriend's apartment, and she told the officer defendant had entered her apartment through the unlocked front door, uninvited, and threatened to kill her.

The trial court instructed the jury that if the People proved by a preponderance of evidence that defendant committed the uncharged domestic violence, the jury could, but was not required to, conclude from that evidence that defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that defendant was likely to commit and did commit the charges in the current case.

B

Evidence Code section 1101, subdivision (a), provides:  "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character

8

or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion."

Evidence Code section 1109, subdivision (a)(1), provides, as relevant here: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." Subdivision (d)(3) of the section provides, as relevant here: " 'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code."

Section 13700 provides in pertinent part: "(a) 'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another. [¶] (b) 'Domestic violence' means abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship."

In *People v. Poplar* (1999) 70 Cal.App.4th 1129, 1139 (*Poplar*), this court ruled that "[t]he definition of domestic violence/abuse ('reasonable apprehension of imminent serious bodily injury to [the person]') encompasses the definition of rape [under section 261, subd. (a)(2)] ('fear of immediate and unlawful bodily injury on the person'). Defendant was charged with an offense involving domestic violence, that is, rape. As the prosecutor argued, rape is a higher level of domestic violence, a similar act of control."

C

Defendant argues this court's analysis in *Poplar* was unsound because this court "failed to recognize that . . . domestic abuse in the form of fear requires fear of *serious* bodily injury, while rape by means of fear only entails fear of any unlawful bodily injury. Therefore, rape does not meet the statutory definition of domestic violence." (Original italics.)

9

But *Poplar* does not stand alone.  In *People v. Garcia* (2001) 89 Cal.App.4th 1321 (*Garcia*), the Sixth District agreed that sexual assault may in some cases be an act of domestic violence for purposes of Evidence Code section 1109.  (*Garcia*, at p. 1333 ["we are persuaded that the analysis of the court in *Poplar* correctly links other acts of domestic violence with sexual assault or rape as an act of domestic violence"].)  And in *People v. Brown* (2011) 192 Cal.App.4th 1222 (*Brown*), the Fifth District approvingly discussed this court's reasoning in *Poplar*.  (*Id.* at p. 1236.)

In *Brown*, the court rejected the defendant's argument that his prior acts of domestic violence "were inadmissible because he was not charged with committing domestic violence in the instant case; he was charged with murder, and murder is not listed in section 1109 as an offense involving domestic violence."  (*Brown, supra*, 192 Cal.App.4th at pp. 1233-1234.)  In the circumstances of that case, the court reasoned, "murder [was] 'the ultimate form of domestic violence.' "  (*Id.* at p. 1237.)

The court explained that "the facts and circumstances of defendant's relationship with [his ex-girlfriend, who he murdered] were indicative of defendant's ' "larger scheme of dominance and control" ' which he attempted to exercise over [the victim] as he became angry, watched her activities, followed her, and tried to prevent her from having any other relationships.  [Citation.]  Defendant's prior acts of domestic violence, committed against the four women he dated before [the victim], were also indicative of 'cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner.'  [Citation.]"  (*Brown, supra*, 192 Cal.App.4th at p. 1237.)

The court explained that the legislative history of Evidence Code section 1109 supported its conclusion, quoting from an Assembly Committee analysis of the law, which observed that a " ' "propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases.  Not only is there a great likelihood that any one battering episode is part of a

10

larger scheme of dominance and control, that scheme usually escalates in frequency and severity." ' " (*Brown, supra*, 192 Cal.App.4th at pp. 1235-1236, italics omitted.)

Likewise here, M.V.'s testimony (that defendant slapped her on previous visits, and that she decided to end her May 2016 visit early because defendant grabbed her by the neck) suggested that the circumstances of her relationship with defendant indicated escalating conduct of dominance and control. And that conduct could also be seen in defendant's prior acts of domestic violence against his ex-girlfriend. Thus, under *Brown*, *Poplar*, and *Garcia,* where defendant's acts of kidnapping, rape, assault, and sodomy were intertwined with his efforts to dominate and control M.V., those charged offenses "involv[ed] domestic violence" for purposes of Evidence Code section 1109, and the trial court's instruction was proper.

The cases relied upon by defendant on this issue are inapposite and do not disagree with *Brown, Poplar*, or *Garcia*. (See *People v. Jandres* (2014) 226 Cal.App.4th 340, 355-356 [evidence that defendant exhibited sexual interest in a young girl did not support an inference that defendant was predisposed to rape an 18-year-old woman]; *People v. Disa* (2016) 1 Cal.App.5th 654, 673-674 [abuse of discretion to admit highly inflammatory evidence that was not specifically relevant].)

Defendant's contention lacks merit.

## II

Defendant next argues that because there were two separate events that could have formed the basis of a kidnapping verdict, his kidnapping conviction and the kidnapping enhancements to his rape and sodomy convictions must be reversed because the trial court did not give a unanimity instruction. The People respond that the trial court did not err, as kidnapping involves a "continuous course of conduct . . . not susceptible to a unanimity instruction" and the kidnapping here "was a prolonged detention, which was at no point interrupted." The People further argue that any error was harmless.

11

As we explain, we agree that any error was harmless in light of the prosecution's election and the jury's finding on the kidnapping enhancement associated with the rape conviction.

A

Addressing the kidnapping charge in closing argument, the prosecutor explained the elements of the crime, and then said: "So what are we talking about here? We're talking about when [M.V.] goes to the taco truck. She arranges for the taxi to be there to go to the train station after. And it's the point where defendant takes [M.V.] -- stops her from getting into the taxicab, that's where she wants to go, stops her from taking the taxicab. Forcefully takes her over to his car. Puts her in his car. And then takes her to her apartment. And then ultimately takes her to Fairfield. So that's what we are considering."

Later, the prosecutor told the jury: "[T]he kidnap starts from the taco truck all the way until [M.V.] gets to safety. It's initiated at the taco truck. Until she gets free from him and gets to safety at the [hospital], that's the span of the kidnapping crime."

However, in discussing the kidnapping allegation associated with the rape charge, the prosecutor explained that to find the allegation true, the jury had to decide that "the movement of [M.V.] substantially increased the risk of harm to her beyond that necessarily present in the rape by force, fear, or threats." "So what does that mean?" the prosecutor asked. "So basically if [defendant] had tried to rape [M.V.] in front of the taco truck, would that have been as easy as trying to rape her over in the apartment where they were secluded and alone behind closed doors and nobody could enter? Clearly moving her from a public place to a private apartment, secluded, isolated, gave him the opportunity to commit this crime and placed her in much more risk of physical harm."

Addressing kidnapping in rebuttal closing argument, the prosecutor emphasized the evidence showed defendant could not have reasonably believed M.V. consented to her movement from the taco truck. (The prosecutor did not discuss the kidnapping

12

allegation associated with the sodomy charge at any point in closing argument. But she did argue that the sodomy occurred at the apartment.)

Later, and consistent with the prosecutor's description of the elements for the kidnapping enhancement, the trial court instructed the jury that if it found defendant guilty of rape and sodomy, it had to decide whether for each crime the People proved the additional allegation that defendant kidnapped M.V., substantially increasing the risk of harm to her beyond that necessarily present in the rape and sodomy. Then, as to the rape charge, the trial court instructed the jury that it had to unanimously agree on which act defendant committed, because the People had presented evidence of more than one act of rape. But the trial court declined defendant's request that it give a similar instruction to the jury regarding the kidnapping charge.

B

"In a criminal case, a jury verdict must be unanimous. [Citations.] . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.] [¶] This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.] . . . [¶] On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)

In *People v. Cortez* (1992) 6 Cal.App.4th 1202, 1209, the court ruled that a unanimity instruction was not required vis-à-vis a kidnapping charge due to the "continuing course of conduct" exception, explaining, "[t]he evidence at trial revealed no

13

interruption in defendant's detention of [the victim]. . . . Consequently, the kidnapping continued throughout the allegedly separate events singled out by defendant. [¶] '[A] unanimity instruction is not required when the case falls within the continuous course of conduct exception.' [Citation.] This exception is applicable where, by its very nature, the charged offense consists of a continuous course of conduct. [Citation.] Kidnapping inherently involves a continuous course of conduct. [Citation.] The kidnapping herein was a prolonged detention which was at no point interrupted. Hence, a unanimity instruction was not required."

C

Defendant argues *People v. Cortez* articulates a correct general principle that is misplaced here where there was a series of movements that took place in stages, broken up by other events indicating M.V. "may have consented to some movements but not others." Defendant contends the jurors could have disagreed over whether M.V. movements from the taco truck to defendant's home or defendant's home to his parents' home the following day were by force or fear.

But even if defendant's argument had merit, any error by the trial court in declining to provide a unanimity instruction on the substantive kidnapping charge was harmless, because as to the kidnapping enhancement allegation associated with the rape charge, in closing argument the prosecutor elected among the crimes (*People v. Russo*, *supra*, 25 Cal.4th at p. 1132) by relying solely on the movement from the taco truck to defendant's home, and a true finding on the allegation required the jury to determine the movement substantially increased the risk of harm to M.V., whereas the substantive kidnapping charge did not contain that additional element.

III

Defendant argues his kidnapping and sodomy convictions, and the kidnapping enhancements associated with his rape and sodomy convictions, must be reversed because the trial court improperly instructed the jury not to consider lesser offenses

unless they first unanimously agreed that defendant was not guilty of the greater offenses. The People agree there was error but argue the error was harmless as the evidence for the verdicts was substantial. We conclude the trial court's error was harmless as to the kidnapping conviction and the kidnapping enhancement to the rape conviction, but the sodomy conviction and its associated enhancements must be reversed.

A

The trial court instructed the jury: "If all of you find that the defendant is not guilty of a greater crime, you may find him guilty of a lesser crime if you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime. A defendant may not be convicted of both a greater and lesser crime for the same conduct." The trial court then identified the relevant lesser included offenses in the case, but provided the elements only for attempted sodomy. The trial court concluded: "It is up to you to decide the order in which you consider each crime and the relevant evidence. But I can accept a verdict of guilty to a lesser crime only if you have found the defendant not guilty of the corresponding greater crime."

The jury submitted notes to the trial court during deliberations. The first note asked: "What are the requirements for false imprisonment? What are the requirements for simple assault? and simple battery?" A second note said: "Instruction #460 for P.C. 664 states that the defendant may be guilty of attempt even if we conclude that sodomy P.C. 286(c)(2)(A) is completed. However in instruction #3517 it states that a defendant may not be convicted of both a greater and lesser crime."

The trial court realized it had not instructed the jury on the elements for most of the lesser included crimes and instructed the jury on the previously omitted elements. As to the second note, the trial court clarified to the jury that defendant could not be convicted of both sodomy and attempted sodomy.

The jury subsequently submitted a third note that stated in relevant part: "If the jury cannot agree on whether the defendant is guilty of the greater charge, can the jury

15

then find the defendant guilty of the lesser charge?" The trial court responded, "No, before the jury can consider the lesser charge all twelve jurors must find the defendant not guilty of the greater charge."

B

"[A] court may restrict a jury from returning a verdict on a lesser included offense before acquitting on a greater offense, but may not preclude it from considering lesser offenses during deliberations. (*People v. Berryman* [(1993)] 6 Cal.4th [1048,] 1073; *People v. Kurtzman* (1988) 46 Cal.3d 322, 324-325.) Thus, a trial court should not tell the jury it must first unanimously acquit the defendant of the greater offense before deliberating on or even considering a lesser offense. (*People v. Kurtzman*, *supra*, 46 Cal.3d at pp. 328, 335.)" (*People v. Dennis* (1998) 17 Cal.4th 468, 536.)

In a noncapital case, instructional error regarding lesser included offenses supported by the evidence is reviewed for prejudice under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836, whereby a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error. (*People v. Beltran* (2013) 56 Cal.4th 935, 955.)

C

The parties agree the trial court's instruction to the jury not to *consider* a lesser charge before finding defendant not guilty of the relevant greater charge was error. Defendant argues the error was prejudicial as to the kidnapping and sodomy verdicts because "there is ample evidence supporting one or more jurors' apparent doubt about kidnapping and sodomy."

Regarding kidnapping, defendant argues a juror may well have had reasonable doubt about kidnapping given the jury's question about the lesser included offense of false imprisonment. Defendant suggests reasonable jurors could have found that M.V. went willingly in moving from the taco truck to defendant's apartment. As for the second movement from the apartment to Fairfield, defendant claims some jurors could have

16

doubted that the movement was nonconsensual because M.V. continued to date defendant after he became abusive because she loved him.

As for sodomy, defendant argues the jurors could have found that the sodomy was accidental or incomplete for several reasons. He claims that when M.V. testified defendant's penis penetrated her anus "a little bit," she could have meant that defendant's penis merely pressed up against her anus. He also notes that the jury asked the trial court about attempted sodomy.

1. *Kidnapping*

Defendant has not persuaded us there was a reasonable probability of a more favorable result regarding the kidnapping conviction and the kidnapping enhancement associated with the rape conviction. (See *People v. Hernandez* (2011) 51 Cal.4th 733, 746 [defendant's burden].) This is so because as we explained earlier, the jury's verdicts dispel any plausible notion that a juror had a reasonable doubt that defendant committed an offense when he stopped M.V. from getting into the taxi and forcibly moved her to his apartment. Given the kidnapping enhancement finding associated with the rape conviction that defendant's movement of M.V. to his apartment substantially increased the risk of harm to her, it is clear no juror had a reasonable doubt the offense was kidnapping, rather than false imprisonment. (See *People v. Lewis* (2001) 25 Cal.4th 610, 646 ["[e]rror in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions"]; *People v. Majors* (1998) 18 Cal.4th 385, 410-411 [ruling a trial court has no sua sponte duty to instruct on " 'lesser included enhancements,' " in part because the risk of a " ' "distortion of the factfinding process . . . when the jury is forced into an all-or-nothing choice between" ' " guilt and innocence "is wholly absent with respect to enhancements, which a jury does not even consider unless it has already convicted defendant of the underlying substantive offenses"].)

### 2. *Sodomy*

Nevertheless, we are persuaded the trial court's error was prejudicial as to the sodomy conviction, because (1) M.V.'s testimony was less conclusive regarding sodomy, (2) the jury expressly asked the trial court about attempted sodomy, and (3) the jury did not otherwise necessarily decide the relevant factual question of sodomy.

The evidence of sodomy was M.V.'s testimony that defendant pulled down his pants, sat on top of the bathroom toilet, told M.V. to sit on top of him, and "was going to penetrate" M.V.'s anus with his penis, but -- when M.V. "started to cry" -- he "just . . . decided not to do it," though "there was a little bit of penetration when he was just starting to do it."

While this testimony may be substantial evidence of sodomy (see § 286, subd. (a) ["[a]ny sexual penetration, however slight, is sufficient to complete the crime of sodomy"]), it is less conclusive than M.V.'s testimony regarding defendant's other crimes, as M.V. said defendant "decided not to do it."

Moreover, the jury's second question to the trial court suggests that -- before the trial court's improper instruction to the jury not to consider a lesser included offense until "all twelve jurors . . . f[ound] the defendant not guilty of the greater charge" -- the jury may have begun considering the lesser included offense of attempted sodomy, and was seeking clarification on the implication of a possible finding that defendant completed the act.

Further, in contrast to the kidnapping conviction and the kidnapping enhancement finding associated with the rape conviction, there is no other sodomy finding that would dispel the plausible notion that a juror may have had a reasonable doubt that defendant sodomized M.V.

Accordingly, we will reverse the sodomy conviction and its associated enhancements. Because instructional error does not implicate double jeopardy concerns, the People may elect to retry defendant on the sodomy charge. (See *People v. Hallock*

18

(1989) 208 Cal.App.3d 595, 607; *People v. Franco* (2009) 180 Cal.App.4th 713, 725-726.)

IV

Defendant's final claim is that he is entitled to an additional day of presentence custody credit because he spent 746 days in custody, not 745. Defendant maintains there were 746 days from his arrest on May 27, 2016 to his sentencing on June 11, 2018. Acknowledging a conflict in the record regarding the day defendant was arrested, the People nevertheless argue the more reasonable interpretation is that defendant was arrested on May 28, 2016, as stated in the probation report.

Here, trial testimony established that Fairfield police officers arrested defendant on May 27, 2016. The narrative portion of the probation officer's report agrees defendant was arrested on May 27, 2016, and explains that defendant was returned to Stockton and booked into the San Joaquin County Jail.

A non-narrative portion of the presentence report records the date of arrest as May 28, 2016, and the arresting entity as the Stockton Police Department. Thus, it appears that, having been handed over to the Stockton police some time after his arrest by the Fairfield police, defendant may have been booked into the San Joaquin County jail the next day, on May 28, 2016, and the probation officer used that date as the date of arrest.

Because a defendant is entitled to credit from the day of arrest to and including the day of sentencing (*People v. Smith* (1989) 211 Cal.App.3d 523, 525-527), the trial court should have awarded defendant 746 days of actual custody credit, not 745.

DISPOSTION

The sodomy conviction and its associated enhancements are reversed; the remaining convictions and enhancements are affirmed. Upon issuance of the remittitur, the People may choose to retry the sodomy charge. When appropriate, the trial court shall resentence defendant and include an award of an additional day of presentence

19

custody credit, for a total of 858 days of presentence credit.  The trial court shall provide a copy of the new abstract of judgment to the Department of Corrections and Rehabilitation.


/S/
MAURO, J.

We concur:


/S/
HULL, Acting P. J.


/S/
MURRAY, J.